**UNITED STATES of America,
Plaintiff,**

v.

**Thelmon F. STUCKEY III, Defendant.**

**No. CR. 97–80625.**

United States District Court,
E.D. Michigan,
Southern Division.

July 8, 2004.

J. Michael Buckley, Esq., Asst. U.S. Attorney, Detroit, MI, for plaintiff.

Anthony T. Chambers, Esq., Jeffrey A. Taylor, Esq., Detroit, MI, for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED ON SEPTEMBER 6, 2002 FROM 3350 SWEETWATER ROAD # 609

ROSEN, District Judge.

### I. INTRODUCTION

Defendants Thelmon F. Stuckey III, Dinnis Sifford, and Verdell Murrie are named in an eight-count third superseding indictment returned by the grand jury on January 23, 2003. Count One charges all three Defendants with conspiring to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841 and 846, with this alleged conspiracy spanning from some time in 1993 to February 9, 2000. Count Two charges Defendant Stuckey with murdering Ricardo Darbins on August 6, 1996 to prevent him from communicating information about Stuckey's illegal activities to a law enforcement officer. Count Three charges that Defendants Sifford and Murrie were accessories after the fact to the murder of Ricardo Darbins.[1]

In Counts Four and Seven, Defendant Stuckey is charged with money laundering offenses. Count Five charges Defendant Stuckey with being a felon in possession of a firearm. In Count Six, Stuckey is charged with witness tampering, based on a December 11, 2001 incident in which he allegedly threatened to kill government witness Steven Felder during an unauthorized visit to the jail where Felder was being held. Finally, Count Eight includes a number of forfeiture allegations against property found in connection with Defendant Stuckey's September 6, 2002 arrest at an apartment in Lawrenceville, Georgia.

By motion filed on November 18, 2003, Defendant Stuckey now seeks to suppress the evidence seized from the Lawrenceville apartment shortly after his September 6, 2002 arrest, during a search that followed Defendant's apprehension by U.S. Marshals under an outstanding federal arrest warrant. In support of this motion, Defendant argues that the warrant authorizing the search of the Lawrenceville apartment did not rest upon a proper showing of probable cause, and that, in any event, the search of the apartment exceeded the scope of the warrant. In response, the Government contends that Defendant lacks standing to challenge the search of the apartment, and that any purported defects in the search warrant would be overcome by the good-faith exception to the exclusionary rule.

On January 23, 2004, the Court held a hearing on this and a number of other motions filed by the parties.[2] Having con-

---

1. In a recent order, the Court dismissed this charge as to Defendant Sifford as barred by the applicable five-year statute of limitations, and the Government subsequently dismissed this charge as to Defendant Murrie.

2. Most of these motions were resolved on the record at the January 23 hearing. Among the matters addressed at this hearing, the Court heard argument on a second motion to suppress filed by Defendant Stuckey, concerning statements obtained and evidence seized in

sidered the arguments of counsel at this hearing, and having reviewed the parties' written submissions and the record as a whole, the Court now is prepared to rule on Defendant's motion. This Opinion and Order sets forth the Court's rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The initial indictment in this case was returned in June of 1997, and charged Defendants Verdell Murrie and Steven Felder with a single count of possession with intent to distribute cocaine. This charge arose from a buy-bust operation carried out by ATF agents on April 15, 1997, in which over 112 grams of crack cocaine allegedly were seized. The two men were released following their arrest, and the Government asserts that they became fugitives. Both men were apprehended in 2000, and both have entered into plea agreements on the cocaine possession charge.[3]

According to the Government, its agents first learned in October of 2000 about the drug conspiracy alleged in Count One of the present indictment and the circumstances surrounding the 1996 murder of Ricardo Darbins. Based on this information and subsequent investigation, a sealed superseding indictment was returned on April 17, 2002, which for the first time

named Thelmon F. Stuckey III and Dinnis Sifford as defendants, and which included the drug conspiracy, murder, and accessory after the fact charges that continue to appear in the most recent indictment.[4]

On March 7, 2002, shortly before he was first named as a party in the April 17, 2002 superseding indictment, Defendant Stuckey was arrested in Dearborn, Michigan, and a patdown search allegedly uncovered a loaded semiautomatic handgun concealed in Defendant's waistband.[5] At the time of this arrest, Defendant was on federal supervised release following his conviction on a charge of being a felon in possession of a firearm. As a result of this Dearborn encounter, a federal arrest warrant was issued for a suspected violation of the conditions of Defendant's supervised release, and Defendant was charged in Michigan court with the felony offense of carrying a concealed weapon.[6] According to the Government, Defendant posted a $50,000 cash bond with the state court, but then failed to appear for a preliminary examination, and instead became a fugitive.

Apart from the federal arrest warrant relating to the conditions of Defendant's supervised release, an additional, sealed federal warrant for Defendant's arrest was issued in conjunction with the return of the April 17, 2002 superseding indictment in this case. In the ensuing effort to locate

---

connection with his arrest on March 7, 2002 in Dearborn, Michigan. This motion was denied, but without prejudice to Defendant's opportunity to file a supplemental brief identifying authority for a pretext-related argument raised by his counsel at the hearing. Because Defendant elected not to file this brief, the Court's tentative ruling on the record at the January 23 hearing stands as the final disposition of this motion.

3. In a judgment entered on January 31, 2001, Defendant Murrie was sentenced to 121 months of imprisonment, and he is currently serving this sentence. Felder has not yet been sentenced.

4. The April 17, 2002 superseding indictment no longer listed Steven Felder as a party, and Verdell Murrie was not charged in the drug conspiracy count of this indictment. Murrie subsequently was named, however, as a member of the drug conspiracy alleged in Count One of the third superseding indictment.

5. As noted, this arrest formed the basis for a separate motion to suppress filed by Defendant Stuckey, which the Court denied on the record at the January 23, 2004 hearing.

6. The felon-in-possession offense charged in Count Five of the present indictment also stems from this Dearborn incident.

and arrest Defendant, federal agents in Detroit contacted their counterparts in Atlanta, Georgia, based upon their belief that Defendant occasionally obtained supplies of cocaine in the Atlanta area.

On September 6, 2002, at around 12:15 p.m., deputy U.S. Marshals located and arrested Defendant at 3350 Sweetwater Place, Apartment # 609, in Lawrenceville, Georgia. Defendant was found in the rear bedroom of this apartment, while two other men were found in the front bedroom. The U.S. Marshals notified Atlanta DEA agents of this arrest, and further advised that, while making this arrest, they had observed a marijuana cigarette in plain view on the living room mantel. The agents also were told that the Marshals had observed an open travel bag containing a large quantity of U.S. currency in the room where Defendant had been found.

Based on this information, DEA task force agent Tony Lockard, a local county police officer, sought and obtained a search warrant for the Sweetwater apartment from Gwinnett County, Georgia Magistrate James C. Williford. Officer Lockard's affidavit in support of this warrant stated that a marijuana cigarette had been observed on the fireplace mantel of the apartment during Defendant's arrest. The affidavit mentioned that Defendant had been arrested under a warrant, but provided no details about the underlying basis for the arrest warrant or the charges contained in the corresponding federal indictment. The search warrant application described the location to be searched as apartment # 609, including curtilage and vehicles maintained at the residence, and it cited marijuana possession as the suspected offense that provided probable cause for the search. Finally, Officer Lockard identified "marijuana" as the sole item to be searched for and seized, and he crossed out additional references to items used to distribute marijuana, documents relating to the sale of marijuana, and cellular phones. The search warrant issued by the state magistrate precisely tracked Officer Lockard's application.

DEA agents executed this search warrant in the late afternoon or early evening of September 6, 2002, several hours after Defendant's arrest. The agents seized the marijuana cigarette seen on the living room mantel, and also seized from the rear bedroom where Defendant was found: (i) $13,441 in U.S. currency; (ii) three crocodile leather coats and hats with an appraised value of over $21,000; (iii) assorted jewelry, watches, and chains with an appraised value of over $169,000;[7] (iv) five cellular phones with chargers, along with a note warning against excessive phone usage; and (v) a template for a T-shirt warning individuals not to "run yo mouth" as "snitches."[8]

In the course of their search, the agents also entered the apartment's attached garage, where they discovered a black 2003 Mercury Marauder. This vehicle was registered to "Lauren Elottie Reynolds" of Detroit, and the glove box contained paperwork indicating that the car had been purchased with a $7,000 cash down payment. In the trunk, the agents found a blue knapsack with various photographs and documents, including: (i) photos of Defendant; (ii) an address book with the name and cell phone and pager numbers of Dorian Merriewether, a Wayne County Sheriff's Deputy who allegedly was re-

---

7. The currency, apparel and jewelry, with total appraised value of $203,606.00, comprise the assets that are the subject of the forfeiture allegations set forth in Count Eight of the third superseding indictment.

8. Also observed in this bedroom, but not seized, were several baseball caps with an embroidered "no snitches" logo.

sponsible for Defendant's unauthorized jail visit referred to in Count Six of the indictment; (iii) the address of co-Defendant Verdell Murrie; (iv) papers that included handwritten rap music lyrics; and (v) a business card with handwritten references to "Den Den," the alleged nickname of co-defendant Dinnis Sifford, and to former co-Defendant M.C. Higgins.[9]

Through his present motion, Defendant now seeks to suppress all of the evidence seized during the September 6, 2002 search of the Sweetwater apartment. In support of this motion, Defendant contends that the affidavit accompanying the application for a search warrant failed to establish probable cause for the ensuing search of the apartment, and that a reasonable officer would have realized this despite the Georgia magistrate's decision to issue the requested warrant. In addition, Defendant asserts that the search conducted by the DEA agents exceeded the scope of the warrant, which was limited by its terms to the search and seizure of marijuana. The Government responds that Defendant lacks standing to challenge the search of the Sweetwater apartment. The Government further asserts that, notwithstanding any alleged defects in the search warrant, there is no basis for applying the exclusionary rule under the facts and circumstances presented here.

### III. ANALYSIS

**A. Defendant Lacks a Sufficient Fourth Amendment Privacy Interest in the Sweetwater Apartment to Challenge the Search of This Dwelling.**

Before considering the legality of the search warrant and the ensuing seizure of various items from the Sweetwater apartment, the Court first turns to a threshold issue raised in the Government's response to Defendant's motion. In particular, the Government contends that Defendant lacks a sufficient constitutionally protected interest in the Sweetwater apartment to seek the exclusion of evidence from the search of this location, where Defendant arrived at this dwelling just a few hours before his arrest, and where he purportedly viewed it only as a short-term place to hide from the authorities. In response, Defendant asserts that he was using the apartment by the permission of the owner through an oral subleasing arrangement, and that his motivation for doing so is legally irrelevant to a Fourth Amendment analysis. The Court finds that the Government has the better of this argument, for two reasons.

■ "Since the decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been the law that 'capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *Olson,* 495 U.S. at 95–96, 110 S.Ct. at 1687 (internal quotations and citations omitted). Moreover, the Supreme Court has emphasized that a place need not "be one's 'home' in order for one to have a legitimate expectation of privacy there." 495 U.S. at 96, 110 S.Ct. at 1688. Accordingly, the threshold question here is whether Defendant had a legitimate expectation of privacy in the Sweetwater apartment.

---

**9.** Defendant Higgins recently passed away, and thus is no longer a party to this case.

The parties' dispute on this point primarily concerns the degree of similarity of this case to the situations addressed in *Olson* and a more recent Supreme Court decision, *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). In *Olson*, defendant Rob Olson was identified as the driver of the getaway car following a gas station robbery and killing, and the police learned that Olson had been staying in the upstairs unit of a duplex as a guest of the two women who lived there. The police surrounded the home, and then called one of the women on the telephone and told her to send Olson out of the house. The detective who placed the call heard a male voice instruct the woman to say that he had left, and the women then relayed this information to the detective. Within a few minutes, the police entered the home without permission or a warrant, and found Olson hiding in a closet.

The Supreme Court held that this warrantless entry and arrest violated Olson's Fourth Amendment rights. In so ruling, the Court rejected the State's argument that Olson lacked sufficient control over the premises—he had no key, for example, and was never left alone in the duplex—to give rise to a reasonable expectation of privacy:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
>
> \*   \*   \*   \*   \*   \*
>
> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest .... [H]osts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Olson*, 495 U.S. at 98–99, 110 S.Ct. at 1689.

Defendant here contends that he has at least as much of a privacy interest in the Sweetwater apartment as the overnight guest had in the dwelling in *Olson*, where Defendant purportedly paid $2,000 to the apartment's owner, Paytra Chambers of Lathrup Village, Michigan, for the use of the apartment. As a result of this transaction, Defendant maintains that he was a lawful tenant who had a key and full dominion and control of the apartment from the time of his arrival. While the defendant in *Olson* was merely a guest, Defendant asserts that he had an even more substantial expectation of privacy by virtue of his leasehold interest in the Sweetwater apartment.

The Government responds that *Olson* provides little guidance here. As noted, the ruling in *Olson* rested in significant part upon the Court's observation that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Olson*, 495 U.S. at 98, 110 S.Ct. at 1689. In this case, by contrast, Defendant arrived at the Sweetwater apartment after

fleeing Detroit and driving all night, and merely used the apartment to sleep for a few hours following his arrival in Georgia. Under these circumstances, the Government contends that *Olson* is largely inapposite, because an individual's presence at a dwelling for a few hours while allegedly fleeing the authorities serves no valuable social purpose and is not a longstanding social custom.

Rather, the Government submits that this case is more analogous to *Carter, supra*. In that case, the defendants were bagging cocaine in a ground-floor apartment, and were joined in this endeavor by the apartment's lessee, Kimberly Thompson, who allowed the defendants to use the residence in exchange for a small quantity of cocaine. As the defendants were engaged in this activity, they were observed by a police officer who looked into the apartment through a drawn window blind.

In holding that the defendants had no legitimate expectation of privacy in the apartment, the Supreme Court distinguished its prior rulings in *Olson* and other cases:

> In *Jones v. United States*, 362 U.S. 257, 259, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the defendant seeking to exclude evidence resulting from a search of an apartment had been given the use of the apartment by a friend. He had clothing in the apartment, had slept there " 'maybe a night,' " and at the time was the sole occupant of the apartment. But while the holding of *Jones*—that a search of the apartment violated the defendant's Fourth Amendment rights—is still valid, its statement that "anyone legitimately on the premises where a search occurs may challenge its legality," *id.*, at 267, 80 S.Ct. 725, was expressly repudiated in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.

> [The defendants] here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with Thompson, or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household. While the apartment was a dwelling place for Thompson, it was for these [defendants] simply a place to do business.

> Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). And while it was a "home" in which [the defendants] were present, it was not their home. Similarly, the Court has held that in some circumstances a worker can claim Fourth Amendment protection over his own workplace. See, *e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). But there is no indication that [the defendants] in this case had nearly as significant a connection to Thompson's apartment as the worker in *O'Connor* had to his own private office. See *id.*, at 716–717, 107 S.Ct. 1492.

> If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the

purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between [the defendants] and the householder, all lead us to conclude that [the defendants'] situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Carter*, 525 U.S. at 89–91, 119 S.Ct. at 473–74 (footnote omitted).

In two recent decisions, the Sixth Circuit Court of Appeals has identified some of the relevant considerations in determining where a case lies in the spectrum between *Olson* and *Carter*. First, in *United States v. Pollard*, 215 F.3d 643 (6th Cir.2000), the Court reviewed the warrantless arrests of Defendants Jerry Pollard and Eddie Rodriguez at a residence rented to a third party, Irma Howard. Pollard had known Howard for several years, had occasionally spent the night at her home, and kept personal belongings in a closet in the living room. Rodriguez, in contrast, had never been to the home before the night of his arrest, had never met Howard before this visit, and brought no personal possessions or luggage with him into the home. The Government argued that neither defendant had a legitimate expectation of privacy in Howard's residence, because they had used this home merely as a convenient location to meet a customer and carry out an illegal drug transaction. The Sixth Circuit agreed that Rodriguez was a "mere visitor" to Howard's home, where "he had never been to the premises before and did not know the renter." *Pollard*, 215 F.3d at 648. As to Pollard, however, the Court held that he had a legitimate expectation of privacy in Howard's residence, where he had stayed at her home on a number of prior occasions and had a long-term relationship with her. 215 F.3d at 647.

More recently, in *United States v. Heath*, 259 F.3d 522 (6th Cir.2001), the Sixth Circuit addressed a warrantless entry into an apartment rented by the defendant's cousin. In the weeks preceding this search, the police had conducted periodic surveillance of the activities of the defendant, Shy Heath, in and around this apartment complex, and had formed a suspicion that he was engaged in illegal drug transactions. Accordingly, the officers detained Heath, and used keys found on his person to gain entry into the apartment building and the specific apartment leased to his cousin, Carmen Horton. Heath challenged this search through a motion to suppress the evidence seized from Horton's apartment, but the district court found that he lacked a reasonable expectation of privacy in the premises. *See Heath*, 259 F.3d at 532.

The Sixth Circuit reversed, holding that the evidence should have been suppressed. In so ruling, the Court cited various indicia of Heath's "acceptance into the household" of his cousin Horton, including that he had slept in the apartment as often as once a week for approximately two years, and that he possessed a key that allowed him "unfettered access to the apartment and the ability to admit and exclude others." *Heath*, 259 F.3d at 533. In addition, because Heath and Horton were cousins, the Sixth Circuit observed that "their familial tie is clearly a 'relationship' which predates the apartment's use for illegal conduct." 259 F.3d at 533. Thus, the Court found it "clear that Heath maintained a legitimate expectation of privacy in Horton's home." 259 F.3d at 533.

■ Upon reviewing the record here in light of these precedents, the Court agrees with the Government that this case is more akin to *Carter* than to *Olson*. The Government states without contradiction that the Sweetwater apartment in which Defendant

was arrested was leased to Paytra Chambers, a Detroit area resident, who first began renting the apartment on May 14, 2002. In an interview conducted a few days after Defendant's arrest, Ms. Chambers reportedly told Government agents that when Defendant learned of her apartment in the Atlanta area, he expressed interest in using it. Ms. Chambers agreed to give Defendant a key to the apartment, and received a payment of $2,000 in return. Ms. Chambers denied any knowledge that Defendant was wanted by the authorities.

The Government further asserts, again without contradiction, that the two men found with Defendant in the Sweetwater apartment, Marcellus Hunter and Richard Whittingham, were interviewed by law enforcement personnel at the scene of Defendant's arrest. Both men stated that they and Defendant had left Detroit on September 5, 2002, driven all night to Georgia, arrived at the apartment at around 6:00 a.m. the following morning, and gone promptly to sleep. Defendant was arrested at approximately 12:15 p.m. that afternoon. Thus, he had been in the apartment for only about six hours at the time he was apprehended.

This record lacks the indicia of frequent visits or a pre-existing relationship that the Sixth Circuit found significant in *Heath* and *Pollard*. To the contrary, there is no indication that Defendant ever visited the Sweetwater apartment at any time before his arrest on September 6, 2002. Even on that occasion, of course, Defendant was in the apartment for only a few hours prior to his arrest. Nor is there any evidence of an ongoing relationship between Defendant and the leaseholder, Ms. Chambers, that might account for her willingness to allow Defendant to use her apartment. Rather, Defendant himself acknowledges in his reply brief that this was essentially a business transaction, in which Ms. Chambers was paid $2,000.00 to "sublease" her apartment to him. (Defendant's Reply Br. at 2.) Thus, the Court finds nothing here that would trigger the "overnight guest" rationale of *Olson*, or would otherwise suggest that Defendant used the Sweetwater apartment in accordance with some sort of "longstanding social custom that serves functions recognized as valuable by society." *Olson*, 495 U.S. at 98, 110 S.Ct. at 1689.

Nor, contrary to Defendant's assertion, did his "oral contract" arrangement with the apartment's leaseholder suffice, by itself, to create a legitimate expectation of privacy. Defendant's payment of money conferred, at most, the status of "one merely 'legitimately on the premises,'"[10] a status deemed by the Supreme Court to be insufficient to "claim the protection of the Fourth Amendment in the home of another." *Carter*, 525 U.S. at 91, 119 S.Ct. at 474. Indeed, in *Carter* itself, consideration was given for the use of the apartment— specifically, a small quantity of the cocaine the defendants were packaging at the time. Yet, the Supreme Court did not view this as contributing to the defendants' expectation of privacy in the premises, but to the contrary found that it confirmed the "purely commercial nature" of the defendants' presence in the home. *Carter*, 525 U.S. at 90–91, 119 S.Ct. at 473–74.[11]

10. The Government notes that Defendant's payment to Ms. Chambers arguably failed to secure any legal right to use the property. Under Georgia's statute of frauds, an agreement to convey an interest in real estate must be in writing. *See* Ga.Code Ann. § 13–5–30(4); *see also OfficeMax, Inc. v. Sapp*, 132 F.Supp.2d 1079, 1083 n. 1 (M.D.Ga.2001). Defendant concedes that he had no written agreement with Ms. Chambers to use the Sweetwater apartment.

11. Neither does Defendant's possession of a key to the apartment, standing alone, give rise

Likewise, in this case, Defendant's presence in the Sweetwater apartment at the time of his arrest appears to have been more "business-related" than "social" in character. There is no indication that Defendant arrived at the apartment in order to pay a social visit to anyone in the vicinity. Rather, the Government contends, and Defendant has not disputed, that Defendant used the premises as a place to hide from the authorities. It is true, as Defendant contends, that an unlawful aim does not wholly defeat a legitimate privacy interest—in *Pollard,* for example, defendant Pollard was engaged in a drug transaction at the time of his arrest, and yet the Sixth Circuit held that he had standing to assert a Fourth Amendment challenge. Nonetheless, the nature of Defendant's use of the Sweetwater apartment certainly *is* a valid factor to consider in assessing the strength of his claimed privacy interest, as evidenced by the Supreme Court's reliance on this consideration in *Carter.* Here, the lack of evidence of any socially valuable purpose, combined with the absence of any other sort of prior connection between Defendant and the property or the leaseholder, leads the Court to conclude that Defendant had no legitimate expectation of privacy in the Sweetwater apartment.

In any event, even if these various considerations merely weakened, and did not altogether eliminate, Defendant's right to claim Fourth Amendment protection against a search of the Sweetwater apartment, the Court finds that this diminished expectation of privacy was wholly extinguished by virtue of Defendant's supervised release status at the time of his arrest. As a result of his guilty plea to a federal felon-in-possession offense, Defen-

dant was sentenced to a term of imprisonment followed by three years of supervised release. This period of supervised release began on June 11, 2001, and thus was still in effect at the time of Defendant's arrest on September 6, 2002. During this time, Defendant was subject to a number of conditions, including: (i) that he "refrain from any unlawful use of a controlled substance," (ii) that he "not leave the judicial district without permission of the Court or probation officer," (iii) that he not "purchase, possess, use, distribute or administer any narcotic or other controlled substance," and (iv) that he "permit a probation officer to visit at any time at home or elsewhere" and "permit confiscation of any contraband observed in plain view by the probation officer." (Government's Response, Ex. 2.)

As observed by the Government, albeit in an argument relegated to a footnote, these supervised release conditions implicate the Supreme Court's decision in *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In that case, a California state court had sentenced defendant Mark James Knights to probation for a drug offense, and Knights agreed as a condition of his probation that he would "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Knights,* 534 U.S. at 114, 122 S.Ct. at 589. While Knights was subject to this condition, a detective entered and searched his apartment without a warrant, on suspicion that Knights had been involved in the arson of equipment belonging to a local utility company.

to a constitutionally protected interest in the premises. *See United States v. McNeal,* 955 F.2d 1067, 1069–70 (6th Cir.1992); *cf. Olson,* 495 U.S. at 98, 110 S.Ct. at 1689 (reject-

ing the notion that the defendant in that case lacked a legitimate expectation of privacy because he "was never left alone in the duplex or given a key").

In upholding the legality of this search, the Supreme Court first declined to decide whether Knights' consent to a search condition operated as a complete waiver of his Fourth Amendment rights. Rather, the Court found that the search was "reasonable under our general Fourth Amendment approach of examining the totality of the circumstances, with the probation search condition being a salient circumstance." *Knights,* 534 U.S. at 118, 122 S.Ct. at 591 (internal quotations and citation omitted). The Court explained:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests. Knights' status as a probationer subject to a search condition informs both sides of that balance .... Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may · impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. It was reasonable to conclude that the search condition would further the two primary goals of probation—rehabilitation and protecting society from future criminal violations. The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy.

*Knights,* 534 U.S. at 118–20, 122 S.Ct. at 592–92 (internal quotations, citations, and footnotes omitted).[12]

This reasoning applies with full force here and, when combined with the other considerations addressed earlier, leads the Court to conclude that Defendant had no legitimate expectation of privacy in the Sweetwater apartment. Under the express terms of his supervised release, Defendant agreed to "permit a probation officer to visit at any time at home or elsewhere," and further acknowledged that the probation officer could confiscate "any contraband observed in plain view." Thus, even if Defendant were at home, his probation officer could have visited him unannounced and without a warrant, and could have seized any contraband discovered in plain view.[13] This falls well

---

**12.** Having found that Knights' expectation of privacy was "significantly diminished," the Court deemed it unnecessary to decide whether this expectation was "completely eliminated," thereby permitting a search without any individualized suspicion whatsoever. *Knights,* 534 U.S. at 120 n. 6, 122 S.Ct. at 592 n. 6. While recognizing that the "terms of [Knights'] probation condition permit such a search," the Court declined to "address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion." 534 U.S. at 120 n.6, 122 S.Ct. at 592 n. 6.

**13.** The Court notes that the challenged search in *Knights* was conducted by a law enforcement officer in the course of a criminal investigation, as opposed to a probation officer inquiring whether the defendant had violated a condition of his probation. Nonetheless, the Supreme Court found "no basis for examining official purpose," because its holding rested upon "ordinary Fourth Amendment analysis" rather than a "special needs" justification. *Knights,* 534 U.S. at 122, 122 S.Ct. at 593. Likewise, it is immaterial, for present purposes at least, that the challenged search in this case was conducted by law enforce-

short of the privacy interest enjoyed by a law-abiding citizen in his own home, and places Defendant at a considerable disadvantage in invoking the Fourth Amendment's protection.

But, of course, Defendant was not in his own home. Rather, as discussed above, he was found in a place where he could claim only a diminished, if any, expectation of privacy. What is more, his journey to this location was *itself* a violation of the conditions of his supervised release, which prohibited him from leaving this District without the permission of the Court or his probation officer. In addition, in executing the warrant for Defendant's arrest, the U.S. Marshals discovered still another apparent violation of these conditions—namely, the presence of a marijuana cigarette on the living room mantel of the apartment. The "significantly diminished" expectation of privacy Defendant would have enjoyed in his own home, *see Knights*, 534 U.S. at 120, 122 S.Ct. at 592, surely was altogether extinguished when Defendant fled this District without authorization, only to arrive at a place where, so far as the record reveals, he had never been before, and where his sole claim to entry rests upon a $2,000 payment pursuant to an oral agreement to use the premises in an unspecified way for an indefinite period of time.

Any expectation of privacy that might arise from these circumstances surely cannot be recognized as "legitimate." Consequently, the Court holds that Defendant's Fourth Amendment challenge fails for lack of a constitutionally protected interest in the searched premises.[14]

## B. The Search of the Sweetwater Apartment Rested Upon a Proper Combination of Reasonable Suspicion, a Facially Valid Warrant, and the Plain View Doctrine.

Because Defendant had, at most, a significantly diminished expectation of privacy in the Sweetwater apartment and the Mercury Marauder found in its attached garage, the ruling in *Knights* teaches that probable cause was not required to conduct a search of this dwelling and vehicle, and that "no more than reasonable suspicion" was necessary to justify the search. *Knights*, 534 U.S. at 121, 122 S.Ct. at 592. Nonetheless, Defendant contends that the search warrant issued by the Georgia magistrate was invalid, and that, in any event, the resulting search exceeded the scope of this warrant. The Court disagrees, and further concludes, in the alternative, that the search and seizures that occurred on September 6, 2002 would have been lawful even in the absence of a valid warrant.

██ Under familiar principles, a search warrant will be upheld so long as the issuing magistrate had a "substantial basis for ... concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (internal quotations and citation omitted). This inquiry rests upon consideration of the "totality of the circumstances," and "only the probability, and not a prima facie showing, of criminal

---

ment personnel, and not by Defendant's probation officer.

14. Having found that Defendant had no legitimate expectation of privacy in the Sweetwater apartment, the Court readily concludes that this same reasoning applies with equal force to the search of the Mercury Marauder found in the attached garage of this dwelling.

As noted, this vehicle was registered to a third party, Lauren Reynolds of Detroit, and there is no evidence of a prior relationship between Defendant and this individual or of Defendant's prior, regular use of this vehicle. Rather, Defendant's sole use of this vehicle, at least so far as revealed in the record, was to flee the Detroit area in violation of the conditions of his supervised release.

activity is the standard of probable cause." *Gates,* 462 U.S. at 235, 238, 103 S.Ct. at 2330, 2332 (internal quotations and citation omitted). A magistrate's determination of probable cause is entitled to great deference, and a reviewing court must avoid "line-by-line scrutiny" of the materials submitted in support of an application for a search warrant. *See Gates,* 462 U.S. at 236, 246 n. 14, 103 S.Ct. at 2331, 2336 n. 14; *see also United States v. Allen,* 211 F.3d 970, 973 (6th Cir.2000) (*en banc*).

■ In this case, the affidavit submitted in support of the search warrant for the Sweetwater apartment is aptly characterized as "bare bones." It consists of a single paragraph, and states that upon executing an arrest warrant for Defendant at the apartment at around noon on September 6, 2002, the U.S. Marshals and the applicant for the warrant, Officer Anthony Lockard, observed a marijuana cigarette on the fireplace mantel. (*See* Defendant's Motion, Ex. 2.) Based on this observation, Officer Lockard asserted that there was probable cause to believe that the Georgia offense of marijuana possession had been committed.

As perfunctory as this application might be, the Court readily concludes that it provided a substantial basis for the issuing Georgia magistrate to conclude that probable cause existed to search the Sweetwater apartment. Surely, if a law enforcement officer—or, in this case, more than one— reports having seen marijuana in plain view in an apartment, there is at least a reasonable probability, if not a *certainty,* that evidence of the crime of marijuana possession will be found in the apartment. This is not a case where, for example, the source of the information might not be reliable, or where there is reason to doubt that the reporting eyewitnesses would recognize a marijuana cigarette when they saw one. *See Allen,* 211 F.3d at 975 (observing that if a confidential informant

"saw guns, he is not required to explain how he knew what a gun looks like").

Further, the Court sees little relevance in Defendant's argument that the presence of a single marijuana cigarette does not establish "the probability that greater amounts of marijuana would be found in the home," and would not give rise to a "reasonable belief that [Defendant] was a drug dealer or ... that drugs were being sold from the Sweetwater apartment." (Defendant's Reply Br. at 4.) The latter point carries no weight, because Officer Lockard did not assert, and the Georgia magistrate did not find, that there was probable cause to believe that evidence of drug distribution might be discovered in the apartment. As to the former point, this Court is inclined to believe that the mere presence of marijuana in the apartment, even if only in "personal use" quantities, (Defendant's Reply Br. at 4), provided a substantial basis for the state magistrate to determine that additional marijuana might be found elsewhere in the apartment, its curtilage, or vehicles located at the premises. At a minimum, the searching officers were entitled to rely upon the magistrate's judgment on this matter, as Officer Lockard's affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984) (internal quotations and citation omitted).

■ In any event, *Knights* holds that only reasonable suspicion, and not probable cause, was needed to justify the search of the Sweetwater apartment. After concluding that the search condition in the defendant's probation order resulted in a "significantly diminished" expectation of privacy, the *Knights* Court then reasoned that the "governmental interest" side of the Fourth Amendment balancing inquiry

also was affected by the defendant's status as a probationer:

In assessing the governmental interest side of the balance, it must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law. The recidivism rate of probationers is significantly higher than the general crime rate. And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply.

The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community .... [The State's] interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

*Knights*, 534 U.S. at 120–21, 122 S.Ct. at 592 (internal quotations and citations omitted). Thus, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intru-

sion on the probationer's significantly diminished privacy interests is reasonable." 534 U.S. at 121, 122 S.Ct. at 593. *Knights* further holds that a warrant is not necessary to conduct such a search. 534 U.S. at 121, 122 S.Ct. at 593.

▉ Here, even assuming that the search warrant for the Sweetwater apartment did not rest upon a proper determination of probable cause, there can be no doubt that the searching officers had at least a reasonable suspicion that evidence of Defendant's criminal activity would be found on the premises. Under the terms of his supervised release, Defendant was prohibited from possessing any controlled substance, and the observation of a marijuana cigarette on the mantel at the time of Defendant's arrest provided an ample basis for suspecting that Defendant had violated this condition. More generally, of course, Defendant had violated the conditions of his supervised release simply by leaving this District without permission of the Court or his probation officer.[15] Under *Knights*, then, there was a sufficient basis for a warrantless search of the Sweetwater apartment.

This leaves only Defendant's contention that the search of the apartment and the seizure of evidence exceeded the scope of the warrant, and likewise went beyond a "plain view" justification. It is certainly true that the warrant itself authorized only the search for and seizure of marijuana, and that the magistrate specifically denied the further request to search for and seize "[p]lastic [b]ags, scales, and razor blades used to distribute marijuana," "[d]ocuments relating to the sale of marijuana," and "[c]ellular telephones." (Defendant's Motion, Ex. 1.) Yet, these exclusions mere-

---

**15.** The Court notes that, shortly after his September 6, 2002 arrest, Defendant admitted having violated two of the conditions of his supervised release, and he was found to have violated two other conditions. Accordingly, in a Judgment dated September 27, 2002, Defendant was sentenced to a 14–month term of imprisonment.

ly illustrate Defendant's point, addressed earlier, that the limited information provided to the Georgia magistrate was not sufficient to establish probable cause to believe that the Sweetwater apartment would contain evidence of drug distribution activities.

Nonetheless, the Court cannot accept Defendant's further contention that these limitations in the search warrant somehow operated to overcome the usual "plain view" exception to the warrant requirement. Defendant has not identified any authority for the proposition that a limited search warrant permits the plain view seizure only of those items enumerated in the warrant. Indeed, such a rule would be wholly antithetical to the "plain view" doctrine, which is, after all, an *exception* to the warrant requirement, and which rests upon the *premise* that a seizure cannot be justified by reference to a warrant alone. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir.2002). Moreover, as discussed earlier, the conditions of Defendant's supervised release included his agreement to "permit confiscation of any contraband observed in plain view by [his] probation officer." Surely, the limited warrant issued by the Georgia magistrate did not defeat this pre-existing authority to conduct plain view searches "at [Defendant's] home or elsewhere"—to hold otherwise would be to *punish* the Government for seeking a search warrant.

■ Thus, whether the searching officers in this case had secured only a limited warrant or no warrant at all, this Court's plain view inquiry remains largely the same. In particular, the plain view doctrine permits evidence to be seized despite the lack of a warrant so long as four factors are satisfied: (i) the searching officer must be lawfully on the premises where the evidence is found; (ii) the evidence must be discovered inadvertently; (iii) the incriminating nature of the evidence must be immediately apparent to the officer; and (iv) the item seized must actually be in plain view, in a location to which the officer had a lawful right of access. *See Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038; *McLevain*, 310 F.3d at 439; *United States v. Blakeney*, 942 F.2d 1001, 1028 (6th Cir.1991).

■ For reasons already stated, the Court finds, and Defendant himself acknowledges, (*see* Defendant's Reply Br. at 9), that the first factor is satisfied here. The searching officers plainly had the authority to enter the Sweetwater apartment, both by virtue of the facially valid search warrant granting this authority, and also on the basis of reasonable suspicion that Defendant had violated one or more conditions of his supervised release.

Regarding the requirement of "inadvertent" discovery, Defendant suggests that this factor must be decided in his favor, at least in part, because one of the items seized in the search—specifically, an open travel bag containing a large amount of U.S. currency—was observed by the U.S. Marshals during Defendant's arrest earlier in the day. In light of this knowledge, Defendant maintains that Officer Lockard was obligated to disclose this item in the affidavit in support of the search warrant, and to seek the magistrate's affirmative permission to seize this item during the search. Because he did not do so, Defendant argues that the "plain view" doctrine cannot justify the seizure of the travel bag and its contents.

The Court disagrees, for two reasons. First, the rationale for the requirement of "inadvertence" is that it "imposes no inconvenience whatever, or at least none which is constitutionally cognizable," to insist that the police obtain a warrant to seize evidence of which they "know in ad-

vance" and which they "intend to seize." *Coolidge*, 403 U.S. at 470, 91 S.Ct. at 2040. The "inadvertence" element of the plain view doctrine, in other words, is designed to protect against a "planned warrantless seizure." 403 U.S. at 471 n. 27, 91 S.Ct. at 2041 n. 27. In this case, however, there is not the slightest reason to suspect that Officer Lockard deliberately elected to exclude the information about the travel bag from his search warrant application, in order to lay the groundwork for a planned "plain view" seizure of this item. If he had mentioned the travel bag, and further advised the Georgia magistrate about (i) Defendant's supervised release status, (ii) his apparent violations of the terms of this supervised release, and (iii) the existence of the April 17, 2002 federal indictment charging Defendant with drug conspiracy and murder, there can be no doubt that the magistrate would have issued a much broader warrant authorizing the seizure of the bag and its contents. While Officer Lockard might properly be faulted for preparing a "bare bones" affidavit that omitted much of the pertinent information known by federal agents in Detroit and Atlanta, Defendant has failed to identify any nefarious motive that might explain these omissions. Under these circumstances, it would serve no legitimate Fourth Amendment purpose to invoke "lack of inadvertence" as a ground for excluding the travel bag and its contents from the evidence at trial.

Next, and more importantly, the Court already has observed that, as a result of Defendant's supervised release status, the Government's agents properly could have entered the Sweetwater apartment without a warrant and seized any contraband they discovered in plain view. As explained earlier, it would defy logic to hold that this authority was somehow diminished by the intervening act of securing a limited search warrant. Nor, in this Court's view, is this authority called into question by

virtue of the fact that another Government agent previously saw an item in plain view but failed to seize it. The search condition imposed as a term of Defendant's supervised release could not be "waived" in this fashion, but was available equally to any law enforcement officer with a reasonable suspicion that Defendant had engaged in criminal activity.

Turning to the third "plain view" factor, Defendant argues that it would not have been "immediately apparent" to the searching officers that the items they seized from the Sweetwater apartment were incriminating in nature. Defendant contends, in particular, that there is nothing intrinsically incriminating about such items as cellular phones, jewelry, clothing, and documents, nor would these items necessarily be linked to the marijuana possession offense cited in the search warrant. Yet, "[i]n determining whether the items seized constitute evidence of a crime, the collective knowledge of the searching officers can be considered." *United States v. Poulos*, 895 F.2d 1113, 1122 n. 6 (6th Cir. 1990), *abrogated on other grounds in Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In *Blakeney, supra*, 942 F.2d at 1026–28, for example, a warrant was issued to search for and seize evidence of a jewelry store robbery, but the Sixth Circuit upheld the plain view seizure of documents "relating to the business of manufacturing methamphetamine," where the searching officers knew that the defendant was a fugitive from a methamphetamine conspiracy prosecution and had been indicted for this offense.

*Blakeney* is squarely on point here. If the agents who searched the Sweetwater apartment knew only the limited facts set forth in the search warrant application, the Court might well agree that there would have been no basis for seizing cell phones, jewelry, clothing, and documents. As not-

ed, however, these agents knew a good deal more—in particular, they knew that Defendant had been charged in the April 17, 2002 superseding indictment with drug conspiracy and murder offenses. Under these circumstances, the seizure of several thousand dollars in U.S. currency, expensive clothing, and assorted valuable jewelry (including, for example, a Rolex watch, gold chains, a diamond bracelet, and diamond earrings) was appropriate as evidence of unexplained wealth. *See United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir.1993). In addition, the agents properly seized the documents and cell phones as possible evidence linking Defendant to the charged drug conspiracy.

This leaves only the question whether the searching agents had a lawful right of access to the items seized during the search. Under the search warrant, the officers were entitled to search anywhere in the apartment and its curtilage for evidence of marijuana possession, and the search condition of Defendant's supervised release permitted a search of similar scope. This naturally encompassed the room where Defendant had been arrested, and where the agents found U.S. currency, clothing, jewelry, and cell phones in plain view. The remaining items were seized from the Mercury Marauder found in the apartment's attached garage, and the search warrant again granted the express authority to search any vehicles maintained at the residence. In any event, the agents had a sufficient basis to search the car, which Defendant evidently had used to leave this District in violation of a condition of his supervised release, and exigent circumstances also justified this search, where the two other men found with Defendant in the apartment had been released and were free to drive the car away. *See United States v. Swanson*, 341 F.3d 524, 532–33 (6th Cir.2003). Accordingly, the Court finds that the challenged sei-

zures were proper under the plain view doctrine.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Thelmon Stuckey's November 18, 2003 Motion to Suppress All Evidence Seized September 6, 2002 from 3350 Sweetwater Road # 609 is DENIED.