996 n.5 (6th Cir. 1994). While we generally limit "exigent circumstances" to these three situations, we may recognize new exigencies when necessary. *See United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996). In determining whether to fashion a new exigency, we assess the nature of the government interest involved; the interplay of that interest and the citizen's privacy interests; and whether immediate action is needed. *See id.* at 1518.

In this case, none of our traditionally recognized exigent circumstances justify the officers' search of the home, and the facts of this case do not support creating a new exigency. There is no evidence of any threat to Officer Askew; no evidence that either Pollard or Rodriguez was armed; and no evidence that either Pollard or Rodriguez intended to destroy any evidence. Under the analysis we articulated in *Rohrig*, the government has not demonstrated that it was necessary that the officers raid the home when they received the signal from the informant, nor has it shown, on the facts of this case, that any legitimate government interests purportedly vindicated by the "consent once remove doctrine" override Pollard's privacy expectations. In short, without any specific reason to believe that evidence would be destroyed or that officer safety was in danger, there is no justification for a warrantless intrusion into the sanctity of a private home. Without an exigent circumstance to support the government's entry, all evidence recovered after the illegal search should be suppressed. *See, e.g., United States v. Dice*, 200 F.3d 978, 982-83 (6th Cir. 2000).

While I agree that Rodriguez does not have standing to challenge the government's search, I respectfully dissent from the majority's adoption of the "consent once removed" doctrine and its decision to affirm the denial of Pollard's suppression motion.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0201P (6th Cir.)
File Name: 00a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

        *v.*                        Nos. 98-5908/6118

JERRY POLLARD (98-5908)
and EDDIE RODRIGUEZ
(98-6118),
    *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 97-20159—Julia S. Gibbons, Chief District Judge.

Argued: January 28, 2000

Decided and Filed: June 15, 2000

Before: JONES, NORRIS, and SILER, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Doris A. Randle-Holt, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, Jeffrey M. Brandt, BRANDT LAW OFFICES, Cincinnati, Ohio, for Appellants. Thomas A. Colthurst, ASSISTANT UNITED

STATES ATTORNEY, Memphis, Tennessee, for Appellee.
**ON BRIEF:**  Doris A. Randle-Holt, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE WESTERN
DISTRICT OF TENNESSEE, Memphis, Tennessee, Jeffrey
M. Brandt, BRANDT LAW OFFICES, Cincinnati, Ohio, for
Appellants.  Thomas A. Colthurst, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.

SILER, J., delivered the opinion of the court, in which
NORRIS, J., joined.  JONES, J. (pp. 11-12), delivered a
separate dissenting opinion.

————————

**OPINION**

————————

SILER, Circuit Judge.  Defendants Jerry Pollard and Eddie
Rodriguez appeal their convictions after entering conditional
guilty pleas of conspiracy to possess with intent to distribute
cocaine in violation of 21 U.S.C. § 846.  On appeal, the
defendants argue the district court erred in denying their
motions to suppress evidence because they claim the arresting
officers illegally searched a residence in effecting their arrest.
The government contends that the defendants lack standing to
challenge the search of the residence and that exigent
circumstances justified the entry of the residence without a
warrant.  We AFFIRM.

## I. BACKGROUND

On August 4, 1997, Pollard and Rodriguez were arrested
while selling cocaine to a confidential informant and
undercover police officer.  The arrests occurred in Memphis,
Tennessee, at a residence rented to Irma Howard, who lived
there with her cousin, her son and two grandchildren.  She
had known Pollard about six or seven years, and he
occasionally spent the night there, sleeping on the couch in
the living room.  Pollard kept personal belongings in a closet
in the living room but did not know how to open the door

————————

**DISSENT**

————————

NATHANIEL R. JONES, Circuit Judge, dissenting.  In
affirming the district court's denial of Pollard's motion to
suppress, the majority adopts the Seventh Circuit's "consent
once removed" doctrine.  This rule provides essentially that
when an individual grants an undercover officer consent to
enter a residence, the citizen has sufficiently compromised his
Fourth Amendment privacy expectations to justify a
warrantless search.  *See United States v. Akinsaya*, 53 F.3d
852, 856 (7th Cir. 1995).  Because I believe this doctrine
represents an unjustified extension of our traditional exigent
circumstances jurisprudence, I respectfully dissent.

While the Fourth Amendment is implicated whenever
government attempts to search its citizens, its protections
apply with particular force to the home.  *See Payton v. New
York*, 445 U.S. 573, 590 (1980) (holding that the Framers
drew "a firm line at the entrance to the house").  It is well
settled that warrantless searches of a home are unreasonable
unless supported by probable cause and exigent
circumstances.  *See Pray v. City of Sandusky*, 49 F.3d 1154,
1158 (6th Cir. 1995); *Wilson v. Strong*, 156 F.3d 1131, 1134
(11th Cir. 1998); *see also Welsh v. Wisconsin*, 466 U.S. 740,
750 (1984) ("Before agents of the government may invade the
sanctity of the home, the burden is on the government to
demonstrate exigent circumstances that overcome the
presumption of unreasonableness that attaches to all
warrantless home entries.").

We have recognized the existence of the following three
exigent circumstances: 1) when officers are in hot pursuit of
a fleeing suspect; 2) when the suspect represents an
immediate threat to the arresting officers or the public; or 3)
when immediate police action is necessary to prevent the
destruction of vital evidence or to thwart the escape of known
criminals.  *See O'Brien v. City of Grand Rapids*, 23 F.3d 990,

Although the court found Howard consented to the search, we need not decide that question in light of finding there was a "consent once removed."

AFFIRMED.

without a key.[1] Howard did not know Rodriguez before the night in question, when Pollard brought him to the house.

Before the arrests, on July 31, officers learned that a shipment of drugs was en route to Memphis. On August 4, the informant told Officer Anthony Berryhill that Pollard had contacted him, told him that his source of cocaine had arrived in Memphis from Texas, and arranged to meet him.

At approximately 8:00 p.m., on August 4, the informant met Pollard and Rodriguez at Howard's residence. Rodriguez wrote down the price ($76,500) and the amount (4 kilograms) and told the informant he needed to be back by 10:00 p.m. because Rodriguez was leaving Memphis.

The informant returned to Officer Berryhill's office and gave him the piece of paper. Berryhill wired the informant, assembled a team of officers, and gathered $50,000 in purchase money for the drugs. A "takedown" signal was established. During these preparations, the informant was paged at least twice and returned the calls to tell the sellers he was coming.

Between 11:00 p.m. and 11:30 p.m., approximately six officers and the informant returned to the residence. The back-up officers were monitoring the transmitter on the informant.

The informant and Detective Rodney Askew, who was acting undercover, approached the house and knocked on the door. Pollard admitted them. Rodriguez immediately left by the front door and returned a few seconds later with a duffle bag. Howard then told Pollard to lock the door; Pollard led them to a back bedroom and Howard switched on the light and left. Rodriguez placed the duffle bag on top of the bed,

---

[1]Since the original key had been lost, Howard would lock the house from the inside and return by means of a "little trick lock on the wrought iron door" or she would have one of the grandchildren go through the wrought iron bars and take out a window screen.

opened it, removed some clothes and pulled out three bundles wrapped in plastic. He began to unwrap one of the bundles. The takedown signal was given before Rodriguez finished unwrapping the bundles.

The back-up officers, without knocking or announcing themselves, broke down the front door, entered and said "police, get down." They entered without a prior announcement to avoid the risk that the undercover officer (the "new" face in the transaction) would be taken hostage or injured by gunfire. Howard and her cousin were in the front of the house. Some officers stayed in the front of the house while others went toward the back. One officer forced his way into the locked bedroom where Pollard, Rodriguez, the informant and Askew were gathered. Rodriguez jumped into a closet and Pollard ran into a nearby bathroom. The officers arrested everyone in the room and took them into the living room for questioning.

No threats were made to Askew or the informant. Before the officers entered the house, there were no indications that Pollard or Rodriguez was planning to destroy the drugs.

Howard signed a consent to search form. Although she testified that the drugs had already been removed from the bedroom by the time she signed the form, Askew testified that no evidence had been retrieved from the bedroom prior to the consent to search. After Howard had signed the form, Askew observed one bundle in the closet and one bundle halfway under the bed.

In 1997, Magistrate Judge James H. Allen filed his Recommendation. He found that while Rodriguez had no standing to contest the entry and search, Pollard had a reasonable expectation of privacy in the Howard home and thus had standing to contest the search. But the magistrate reasoned that the question of "exigent circumstances" was controlling.

The district court adopted the magistrate's findings of fact and conclusions of law in part. But the court determined that

been, is being or will be committed," *Sangineto-Miranda*, 859 F.2d at 1507, Askew could have arrested both Pollard and Rodriguez had he chosen to do so.

Instead, Askew relied upon the back-up officers to effect the arrest. The government argues that this court should adopt the doctrine of "consent once removed," which requires the following:

> The undercover agent or informant: 1) entered at the express invitation of someone with authority to consent; 2) at that point established the existence of probable cause to effectuate an arrest or search; and 3) immediately summoned help from other officers.

*United States v. Akinsanya*, 53 F.3d 852, 856 (7th Cir. 1995); *accord United States v. Bramble*, 103 F.3d 1475, 1478 (9th Cir. 1996). In *United States v. Ogbuh*, 982 F.2d 1000 (6th Cir. 1993), this court considered this argument based on the decision in *United States v. Paul*, 808 F.2d 645 (7th Cir. 1986). We held that "assuming without deciding that *Paul* is correctly decided," the case before us was distinguishable because the contraband had been brought by the informant and the agents entered without receiving a signal from the informant. *Ogbuh*, 982 F.2d at 1005.

We adopt the doctrine of "consent once removed" because this entry was lawful under those circumstances. Pollard admitted the undercover officer and informant in Howard's presence; the officer obtained probable cause for an arrest when Rodriguez displayed the cocaine on the bed; and the informant accompanying the officer immediately summoned the other officers for assistance. Moreover, the back-up officers were acting within constitutional limits when they entered to assist him since no further invasion of privacy was involved once the undercover officer made the initial entry.

## III.  LEGALITY OF ENTRY

We review the district court's factual determination that there were exigent circumstances for clear error, while the lower court's legal conclusions with respect to exigency are reviewed *de novo*. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 585 (6th Cir. 1998).  In addition, this court must review the evidence in the light most likely to support the district court's conclusion.  *See United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996).  The government bears the burden of proving exigent circumstances exist.  *See Roark*, 36 F.3d at 17.

It is undisputed that the officers did not identify themselves prior to entry.  The defendants argue there was no exigency justifying the forced entry because they did not suspect that their guests were working with the police.  The district court found that "once the undercover officer had probable cause for the arrest, the raid team was clearly acting within Constitutional limits when they entered to assist him."

Under normal circumstances, the police are required to knock on the door, announce their presence and await admittance for a reasonable time before forcibly entering a residence.  *See Wilson v. Arkansas*, 514 U.S. 927, 929 (1995).  However, it is well established that an undercover officer may gain entrance by misrepresenting his identity and may gather evidence while there.  *See Lewis v. United States*, 385 U.S. 206 (1966); *United States v. Baldwin*, 621 F.2d 251, 252-53 (6th Cir. 1980).  Askew, the undercover officer, entered the apartment at the invitation of Pollard and established the existence of probable cause to arrest when he saw Rodriguez pull out the three drug containers.[4]  As a warrantless arrest "is justified if, at the time of the defendant's arrest, police officers have probable cause to believe that an offense has

---

[4]Citing the First Circuit's decision in *United States v. Santiago*, 828 F. 2d 866 (1st Cir. 1987), the government contends that probable cause did not exist before the cocaine was displayed and hence the officers could not have obtained a warrant prior to the undercover transaction.

---

neither defendant had standing to contest the search, because Pollard "was, at most, a casual visitor."  It further concluded that there were exigent circumstances to justify the entry without a warrant, because the drug sale was being transacted at the time the officers entered, an undercover detective and an informant were possibly in danger and the drugs may have been destroyed by a further delay.  Therefore, it denied the motions to suppress.

Later, Pollard and Rodriguez entered guilty pleas to the conspiracy charge.  Each was sentenced to seventy months imprisonment.

## II.  STANDING OF POLLARD AND RODRIGUEZ

When ruling on a motion to suppress evidence, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*.  *See United States v. Roark*, 36 F.3d 14, 16 (6th Cir. 1994).  Similarly, the trial judge's findings of fact regarding the defendants' standing to challenge alleged Fourth Amendment violations are examined for clear error, while the legal determination of standing is reviewed *de novo*.  *See United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996).

"[I]n determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'"  *Minnesota v. Carter*, 119 S. Ct. 469, 472 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).[2]  Thus, to determine whether the defendants can claim that their Fourth Amendment rights were violated when

---

[2]In *Rakas*, 439 U.S. at 143 n.12, the Supreme Court stated that not all expectations of privacy will be considered "legitimate" for purposes of Fourth Amendment protection: "[L]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *Id*.

officers entered the residence, this court must decide whether Pollard and Rodriguez had "an expectation of privacy in the place searched, and whether [their] expectation[s were] reasonable." *Carter*, 119 S. Ct. at 469. A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate. *See Sangineto-Miranda*, 859 F.2d at 1510.

### A.   Standing of Pollard

On appeal, Pollard argues he had a legitimate expectation of privacy in Howard's home under *Minnesota v. Olson*, 495 U.S. 91 (1990). The government argues that Pollard fails to meet the "heightened" burden under *Carter*, 119 S. Ct. at 469, for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, where the defendant's presence is for an illegal commercial or business purpose. *See United States v. Gordon*, 168 F.3d 1222, 1226 (10th Cir. 1999). The government contends that Pollard lacks standing because he used the Howard home as a convenient site for himself and Rodriguez to meet the customer to complete an illegal sale of cocaine.

In *Olson*, 495 U.S. at 98, the Supreme Court held that an overnight guest had a legitimate expectation of privacy in his host's home and thus could challenge officers' warrantless entry into the home to arrest him. The *Olson* court recognized that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.* But more recently, in *Carter*, 119 S. Ct. at 473-74, the Court held that defendants who were in another's apartment solely for the purpose of packaging cocaine had no legitimate expectation of privacy because they failed to demonstrate they were guests on the premises for a personal occasion, rather than for strictly business purposes. The Court determined that the overnight guest in *Olson* and someone legitimately on the premises represented different ends of the privacy spectrum, and that "the present case is

obviously somewhere in between." *Id*. at 474. The *Carter* Court concluded that defendants were not overnight guests, were only in the home a few hours, had no previous relationship with the lessee, and the purpose of their visit was purely commercial.[3] *Id.* at 493. Thus, the defendants had no legitimate expectation of privacy for their activities and could not contest the search.

Pollard has standing to contest the search. He had been friends for approximately seven years with the lessee, Howard, and had been staying at the home earlier in the week. Furthermore, Pollard occasionally spent the night at the residence and kept some personal belongings in a closet in the living room. In addition, he sometimes ate meals with the family during his visits. Finally, although Pollard did not know the makeshift method to open the door, he was allowed to stay in the home even if the residents were not present.

### B.   Standing of Rodriguez

Rodriguez argues the district court erred in failing to recognize his legitimate privacy expectation in the Howard residence, manifested by his presence in the locked bedroom. The district court found that Rodriguez was a "mere visitor" and had no standing to challenge the search.

We agree that Rodriguez has no standing to contest the search, because he had never been to the premises before and did not know the renter of the premises. Further, when Rodriguez came to the house he did not bring any personal possessions or luggage. Finally, he stated he planned to leave immediately after the cocaine sale and catch a plane back to his home state of Texas. *See Carter*, 119 S. Ct. at 469.

---

[3]The Court explained that an individual's expectation of privacy in commercial premises is "'different from, and indeed less than, a similar expectation in an individual's home.'" *Id.* at 474 (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)). The Court found that, although the apartment was a dwelling place, for the defendants it was "simply a place to do business." *Id.*