UNITED STATES of America, Plaintiff,

v.

**Jeremy E. LEWIS, Defendant.**

**Case No. 3:08–cr–175.**

United States District Court, S.D. Ohio, Western Division, at Dayton.

Dec. 4, 2009.

828

Vipal Patel, United States Attorney's Office, Dayton, OH, for Plaintiff.

William T. Daly, Kettering, OH, for Defendant.

**ENTRY AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE, DOC. 25., FINDING MOOT MOTION TO COMPEL DEFENDANT LEWIS TO ESTABLISH STANDING, DOC. 33, DENYING SECOND MOTION TO SUPPRESS EVIDENCE–SUPPLEMENT, DOC. 47, DENYING MOTION TO SUPPRESS, DOC. 51, DENYING MOOT MOTION TO IMPEACH DETECTIVE BEANE, DOC. 73, DENYING MOTION TO SUPPRESS. DOC. 91.**

THOMAS M. ROSE, District Judge.

Pending before the Court are several motions: Motion to Suppress Evidence, Doc. 25, Motion to Compel Defendant Lewis to Establish Standing, Doc. 33, Second Motion to Suppress Evidence–Supplement, Doc. 47, Motion to Suppress, Doc. 51, Motion to Impeach Detective Bean, Doc. 73, and Supplemental Motion to Suppress. Doc. 91. As an initial matter, the Court notes that the Motion to Compel Defendant Lewis to Establish Standing, doc. 33, requests that the Court require Defendant to establish standing prior to the Government being required to present evidence at a hearing on the motion to suppress. Because the Government has

already presented evidence to justify its actions, this motion is moot.

In docket entries 25, 47, 51 and 91, Defendant Jeremy E. Lewis requests that the Court suppress evidence gathered as a result of the warrantless entry into 409 Forest Park Drive, Apartment H3. In response, the Government asserts that Lewis has no standing to challenge the constitutionality of the entry into the apartment, that police are not constitutionally barred from entering an apartment of a parolee such as Lewis, that exigent circumstances necessitated the entry and that, in any event, the inevitable discovery by means of a warrant that had already been requested salvages the admissibility of evidence collected from the apartment. Because Lewis was a parolee, and because exigent circumstances necessitated the entry, and because the evidence would have inevitably been discovered, the motions to suppress will be denied.

## I. Background

On the morning of December 4, 2008, at approximately 9:30 a.m., three African–American men, with their faces covered and hoods up, robbed the Key Bank located at 4000 Linden Ave., in Dayton, Ohio. (R. 76, 85:3–10; R. 37:25–40:1.) Dayton Police Detective Christen Beane, a veteran and experienced robbery detective, responded to the scene. (R. 74, Tr. 5/29/09, 36:16–15.) After being notified by other law enforcement officers and bank security, FBI Special Agent Robert Buzzard responded to the scene (R. 76, 83:19–85:14) to assisted Detective Beane. (R. 76, 86:25–87:22.)

From speaking with witnesses and reviewing surveillance footage both from surrounding businesses and the bank (R. 76, 38:14–40:1), officers learned that:

—Immediately upon entry to the bank, one of the robbers fired his gun. (R. 74, 39:10–17.)

—The robbers demanded money. (R. 74, 39:20.)

—Some of the robbers jumped the counter and forced a bank employee to accompany them to the vault, where the robbers tried to get the employee to open the vault. (R. 74, 39:20–22.)

—When the employee either could not open the vault, or did not proceed as fast as the robbers desired, the robbers slammed the employee's head against the vault (R. 74, 39:20–24), and when that did not produce the results the robbers hoped for, they fired the weapon once again. (R. 74, 39:24.)

—The robbers fled with money from the bank, which also contained dye packs. (R. 74, 39:25–40:1.)

—Prior to the robbery, a gold or tan Mercury (later identified as a Mercury Tracer) vehicle had been "hanging around the area before the bank opened." "It was suspicious." "They didn't appear to be doing anything." (R. 74, 38:24–39:9.)

The location and methodology of the robbery were familiar to Detective Beane. (R. 74, 40:2–4.) Less than a month before the Key Bank robbery, a cash advance business just a few doors away from the bank had been robbed in a similar manner, i.e., two African–American men bearing similar descriptions, with their faces covered and hoods up, entered the business soon after opening, jumped the counter, forced an employee to a safe, and pistol whipped her when she did not proceed as quickly as the robbers had desired. (R. 74, 40:4–25.) Based on her review of a surveillance video from the cash advance business robbery, Detective Beane suspected that a third person may have been involved in that robbery, namely, the de-

fendant's girlfriend/fiancee, Ms. Carter. (R. 74, 41:1–42:19.) In light of this recent experience and suspected connection, Detective Beane wished to speak with Ms. Carter with regard to the bank robbery. (R. 74.41:22–42:19.)

Detective Beane proceeded to 4324 Cityview Terrace, Apartment B, which is the address Ms. Carter had listed as her address and had used in the past. (R. 74, 42:9–43:21.) The detective made contact with an occupant of the apartment, the defendant's mother, Annette Good. (R. 74, 43:13–23; R. 76, 127:14–128:24.) Ms. Good informed Detective Beane that neither Ms. Carter nor the defendant lived there and provided detailed directions to Ms. Carter's apartment at the Forest Park location. (R. 74, 43:24–44:13; R. 76, 127:19–128:12.) After proceeding to the Forest Park location, but not locating the Mercury car observed earlier in the surveillance footage from near the bank, Detective Beane returned to her office. (R. 74, 44:14–45:4.)

When Detective Beane arrived back at the station, she learned that a car fitting the description of the gold or tan Mercury observed in the surveillance footage had been stopped by an Officer Mark Davis at approximately 1:35 p.m. (R. 74, 45:2–6, 57:12–16.) Detective Beane further learned that the stopped car had red-dye stains on the rear passenger side seat, as well as red-dye stained coins in the back seat. (R. 74, 48:17–19, 54:22–55:1, 58:9–14, Govt. Exh. 7, p. 4.) The officers who made the discovery had experience with bank robbery dye-packs, and recognized that smell of the dye. (R. 74, 60:1–61:24.)

Detective Beane proceeded with her investigation by interviewing one of the occupants of the Mercury car, namely, Megan Worley, while another detective, Detective Baker, interviewed a different occupant, Erica Stewart. (R. 74, 45:7–49:15.) From their interviews of Ms. Worley and Ms. Stewart, the detectives learned that:

—Ms. Worley, the registered owner of the Mercury car, lent her car to the defendant the night before the robbery—free of red stains. (R. 74, 45:23–19, 63:8–19, 85:12–17; Govt. Exh. 7, p. 4.)

—Desiring her car back, Ms. Worley contacted the defendant, who advised her that the car was parked at the Northtown Plaza shopping center in Harrison Township. (R. 74, 46:19–22, 64:24–65:3, 85:17–20; Govt. Exh. 7, p. 4.)

—Ms. Worley, accompanied by her friend, Ms. Stewart, obtained a ride to the Northtown Plaza shopping center, where they found Ms. Worley's car, with the key inside but low on gas—and with red dye stains inside. (R. 74, 46:22–47:1, 85:15–20; Govt. Exh. 7, p. 4.)

—Ms. Worley and Ms. Stewart then drove to 409 Forest Park Drive, in Harrison Township, in order to obtain gas money, where Ms. Carter met them, provided some money, and asked for a ride to a nearby store. (R. 74, 47:1–7, 85:23–86:3; Govt. Exh. 7, p. 4.)

—Ms. Carter stated in front of Ms. Stewart that the defendant left his shoes in the Mercury car, and Ms. Carter proceeded to retrieve the shoes and bag out of the car. (R. 74, 68:1–5.) They drove Ms. Carter to the store, went inside, and observed Ms. Carter purchase seven to nine large bottles of fingernail polish remover. (R. 74, 47:7–9, 85:23–86:3; Govt. Exh. 7, p. 4.)

—They then dropped Ms. Carter off back at the Forest Park apartment, where Ms. Carter went inside with

the polish remover. (R. 74, 47:10–18, 65:4–10, 86:2–3; Govt. Exh. 7, p. 4.)

—Ms. Worley's statements during the interview generally matched and corroborated those of Ms. Stewart's, and both statements were corroborated by virtue of the dye stain found in Ms. Worley's car, though Ms. Worley did add additional details and change some of the details of her statement. (R. 74, 48:2–19, 65:21–25, 70:7–16, 83:2–7.)

Fingernail polish remover, in the experience of Detective Beane and Deputy Sheriff Rick Bergman, is something that bank robbers try to use on the dye from the dye pack to destroy the evidence made by the pack's explosion. (R. 74, 49:11–15, 86:3–7, 91:17–22; R. 75, 25:1–8; Govt. Exh. 7, p. 4.)

After interviewing Ms. Worley and Ms. Stewart, approximately 3:00 p.m., (R. 74, 73:17–25, 78:1–2), Detective Beane decided to apply for a search warrant for the Forest Park apartment, specifically, 409 Forest Park Drive, Apartment H3, in Harrison Township, Montgomery County, Ohio. (R. 74, 49:16–22, 51:15–24; Govt. Exh. 7, p. 1.)

Detective Beane made contact with Judge Cynthia Heck, who presides over the Vandalia Municipal Court, which has jurisdiction over Harrison Township. (R. 74, 49:25–50:1, 88:7–8.) Judge Heck had left work by that point in the day and "was at a Christmas party at somebody else's house." (R. 74, 50:7–19.) Ultimately, Detective Beane "swore out" her affidavit, and obtained a search warrant from Judge Heck at approximately 6:45 p.m., on December 4, 2008. (R. 74, 62:21–22, 75:7–8; Govt. Exh. 7, p. 2.)

Between the time of the interviews of Ms. Worley and Ms. Stewart, and the time the search warrant was obtained, significant activity occurred. Specifically, while Detective Beane worked on obtaining a search warrant, she wanted the Forest Park apartment watched. (R. 74, 73:14.) She relayed her wishes to other detectives and her superior, who asked other law enforcement officers to conduct surveillance of the apartment complex (R. 74, 73:9–16), which they did. (R. 75, 24:4–31:14, 33:22–34:23, 95:1–12, 97:6–13.) The initial instruction to the officers conducting surveillance was simply to watch the apartment to ensure the robbers (of whom photographs had been distributed) did not leave. (R. 75, 24:4–26:3, 33:22–34:13.) In addition to the surveillance efforts, other preparations were underway, including assembling a SWAT team at a nearby parking lot away from the apartment complex to assist with the execution of the warrant once obtained. (R. 75, 106:17–25, 109:10–14.)

After approximately 2 hours of surveillance, shortly before 5:00 p.m., officers learned that local news media planned to air footage of the earlier stop of the Mercury Tracer, and report that dye stain was found in the vehicle and persons had been taken into custody. (R. 75, 31:17–25; R. 74, 7:8–15, 82:15–20.) The surveilling officers feared that if the robbers viewed the broadcasts, they would realize law enforcement was "on their trail" possibly prompting them to hide, escape or commence or accelerate their efforts to destroy evidence. (R. 75, 103:14–21; R. 74, 82:17–25.) While officers took up positions which allowed them to view most of the apartment complex, which was a relatively large, three-story multi-unit building (R. 75, 28:1–3; Govt. Exhs. 4–5), they learned that there was a back door, which they did not have in their sight. (R. 75, 27:13–28:6.) Officers feared that if the robbers left out the back door, they would not be in a position to see them leave or stop them. The fact that the robbery involved a weapon which was fired twice and acts of vio-

lence (including the beating of a compliant bank employee) heightened the officers' concerns about the danger posed to the community if the robbers left the apartment. (R. 75:7:8–15; R. 75, 28:14–20, 36:1–10, 40:12–15.)

Detective Beane decided to contact the occupants of Apartment H3 and to secure the apartment as well as its occupants until the warrant was obtained. (R. 74, 74:6–75:6, 82:15–83:1; R. 75, 31:17–32:16, 48:22–49: 1.) That decision was made by Detective Bean, after conferring with her superiors. (R. 74, 74:13–18.) At the time, Bean was still in the process of applying for the search warrant. She testified that she was "still going to get the warrant no matter what happened," which she did at approximately 6:45 p.m. (R. 74, 74:24–75:8; Govt. Exh. 7, p. 2.)

After receiving their instructions to make contact with the occupants of Apartment H3 and to secure the apartment pending the warrant, the officers conferred as to how best to make contact, considering that the occupants were armed and violent. (R. 74, 6:16–:7:15, 14:21–15:1; R. 75, 35:2–36:22, 74, 6:2–19.) They alerted dispatch and other detectives, and called in uniformed officers to provide visibility, identification, and backup. (R. 74, 7:2–5, 14:19–23; R. 75, 35:3–11, 102:5–14, 108:10–13.) Once the group of officers was assembled and the plan established, they proceeded into the apartment complex and up to the third floor on which Apartment H3 was located. (R. 75, 36:23–25, 104:5–14.) Before knocking on the door to Apartment H3, officers heard male voices from inside. (R. 75, 36:23–37:15.) They then knocked on the door and announced their presence. (R. 75, 37:17–18.) The voices inside stopped abruptly. (R. 75, 37:18–19.) The occupants of the apartment could be heard moving about. (R. 75, 37:19–21.) The officers continued knocking and announcing their presence.

(R. 75, 37:23.) Officers heard the sound of what they believed to be a window opening, and one of the officers, Detective Kent Saunders, reported this to the rest of the officers. (R. 75, 37:23–38:5.) Detective Saunders immediately left the third floor for the rear of the building to view the window from the outside. (R. 75, 38:6–18, 39:19.) He was alone. (R. 75, 39:20–22.) Even though they were on the third floor, the apartment was only the height of a two-story apartment, and officers were concerned that an occupant of Apartment H3 was attempting to flee out the window. (R. 75, 38:18–22.)

Within a short time, as they continued to knock and announce their presence, and as they continued to hear noise from inside the apartment, officers outside the door of Apartment H3 heard Detective Saunders yell "put your hands up" and other loud commands. (R. 75, 38:22–39:7, 41:13–25.) Other officers raced to assist Detective Saunders. (R. 75, 39:16–19, 40:16–20.)

Based on the sound of the window opening, the yelling he heard from Detective Saunders, and the inability to reach Detective Saunders on the radio or through dispatch upon hearing the yelling, Sheriff's Deputy Bergman, who was still positioned outside the door of Apartment H3, feared that one or more of the suspects had already jumped out the window and were being confronted by Detective Saunders alone. (R. 75, 39:8–40:12.) Based on these circumstances, and knowing that the occupants were believed to be armed and violent, Deputy Bergman was concerned for Detective Saunders' safety. (R. 75, 40:7–15.) Deputy Bergman was also concerned for his own safety and that of the officers with him just outside the door to Apartment H3, given the drywall separating them from the occupants, which he knew would be insufficient to hold any bullets should they be fired upon from the

inside. (R. 75, 40:22–41:4.) At that point, which was between approximately 5:15 p.m. and 5:30 p.m., after continuing to knock but no one answering, Deputy Bergman decided to wait no more, and he made entry into Apartment H3 by forcing the door open. (R. 75, 41:4–25.)

After entry, officers conducted a protective sweep of the apartment and encountered the defendant in the main room, observed another defendant (Johnny Wilkerson) run from the living room, and found the third defendant (Trey Geter) in the bedroom. (R. 75, 42:3–44:3.) All three occupants encountered were removed and secured. (R. 75, 44:2–8.) All the officers who were present exited, and the apartment was secured. (R. 75, 44:21–23.) No items were seized from within the apartment, and no search was conducted until after the search warrant had been obtained. (R. 75, 44:19–45:2, 45:13–18; 48:15–21, 53:8–10; R. 83, 14–16.)

Later that evening, officers arrived with the warrant, which was executed, yielding incriminating evidence.

**Analysis**

Defendant Jeremy E. Lewis has requested that the Court suppress evidence gathered as a result of the warrantless entry into 409 Forest Park Drive, Apartment H3. The Government asserts a series of alternative bases for denying the motion: that Lewis has no standing to challenge the constitutionality of the entry into the apartment, that police are not constitutionally barred from entering an apartment of a parolee such as Lewis, that exigent circumstances necessitated the entry and that, in any event, the inevitable discovery by means of a warrant that had already been requested salvages the admissibility of evidence collected from the apartment. Because Lewis was a parolee, and because exigent circumstances necessitated the entry, and because the evidence

would have inevitably been discovered, the motions to suppress will be denied.

■ A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir.1994).

■ Standing to challenge a search hinges on whether a defendant had a reasonable expectation of privacy in the residence. *United States v. Washington*, 573 F.3d 279, 282 (6th Cir.2009). To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable. *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000). An expectation is objectively reasonable only when it is one that "society is prepared to recognize as legitimate." *Id.*

The Sixth Circuit has construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents. *Washington*, 573 F.3d at 283 (citing *Pollard* at 647–48). Evan an occasional overnight guest who is permitted to be in the residence alone and who keeps personal belongings in a closet in the living room has a reasonable expectation of privacy. *Id.* In certain cases, the Sixth Circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence. *Id.* (citing *United States v. Waller*, 426 F.3d 838, 844 (6th Cir.2005)).

The Government challenge to standing is two fold. First, it seems to assert that an individual may only maintain one residence, a position that is not well-founded. The facts which the government admits makes it clear that Lewis had a subjective

privacy interest in Apartment H3. Utility bills at the residence were in his name. (R. 76, 68:15–81–15–22.) Despite stories told to the investigating officers that he did not live there, and reports to his parole officer that he lived elsewhere, Defendant asserted that furniture and clothing at the apartment were his, and he and his mother testified that he had been living there since October 2008. Defendant had a subjective privacy interest in the apartment. But the Government also makes the assertion that the Defendant, who was on parole at the time, should be deemed to have consented to the search by virtue of his failure to report it as a residence to his parole officer.

It is possible that Apartment H3 was a residence Defendant needed to report to the parole authority. However, it is unclear to the Court why the penalty for the possible failure to report his residence should include this Court extending Defendant's agreement to allow "Officers of the Adult Parole Authority [to] conduct warrantless searches of [his] ... residence" to include allowing any law enforcement agency to search any space in which defendant has a privacy interest. Moreover, because this determination is not essential to deciding the motions before the Court, this question will not be resolved.

First, this Court has previously ruled that it is not a federal constitutional violation for any peace officer to search a parolee, so long as the search is not merely to harass:

> Thus, the warrant and probable cause requirements generally do not apply to searches of parolees. *United States v. Smith*, 526 F.3d 306, 308 (6th Cir.2008). Further, reasonable-suspicion standards do not apply. *Id.* at 310. This is because parolees have fewer expectations of privacy than probationers, and thus it is reasonable to conduct a suspicionless search of a parolee. *Id.* (citing *Samson*, 547 U.S. at 850, 126 S.Ct. 2193).

*United States v. Douds*, 2009 WL 2168828, at *9, 2009 U.S. Dist. LEXIS 66729, *21–23 (S.D.Ohio July 21, 2009).

■ Second, exigent circumstances support the police decision to prevent the destruction of evidence. Warrantless entry is permissible, however, if exigent circumstances exist. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir.1992). Exigent circumstances exist where there are "real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir.2002) (citing *O'Brien*, 23 F.3d at 997). The imminent destruction of evidence may give rise to exigent circumstances. *United States v. Williams*, 354 F.3d 497, 503 (6th Cir.2003) (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994)).

■ In the instant case, the Government asserts that the police decided to enter the apartment when they became aware of television coverage of the police investigation, as the detectives feared that it might cause the suspects to hasten their efforts to destroy evidence. Television coverage is not a major concern to the Court, but is the straw that breaks this camel's back. The police already had probable cause to believe that the occupants were bank robbers who were actively trying to obtain materials for use in the destruction of evidence: the fingernail polish. Having reason to believe that the suspects were inside, and knowing that they were actively trying to obtain nail polish remover to destroy evidence by removing dye from clothes and stolen cash provides a sufficient basis for an exigent circumstances exception when fears attendant to television coverage are added. See *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir.1987) ("At any mo-

ment, ... Standridge could have seen his own photo on a television news report about the robberies. If the FBI delayed, Standridge might dispose of the stolen cash or other evidence.")

Finally, the motions to suppress will be denied also because the evidence obtained from the apartment would have inevitably been discovered. Under inevitable discovery exception, a court may admit unconstitutionally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means. See *Nix v. Williams*, 467 U.S. 431, 446–47, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Garcia*, 496 F.3d 495, 505–06 (6th Cir.2007). Here, the limited evidence seized during the initial entry would have been discovered through lawful means very shortly thereafter, namely, through the warrant for which Detective Beane had already applied.

### Other Motions

Finally, Defendant requests that the Court disbelieve the testimony of Detective Bean. Doc. 73. The Court finds the testimony of Detective Beane to be wholly credible, and will deny the motion.

### Conclusion

Thus, because Lewis was a parolee, and because exigent circumstances necessitated the entry, and because the evidence would have inevitably been discovered, the motions to suppress, docs. 25, 47, 51 and 91, are **DENIED.** Because the Government has already produced evidence regarding the constitutionality of the search, the Motion to Compel Defendant Lewis to Establish Standing, doc. 33, is **MOOT.** Because the Court believes the testimony of Detective Beane, The Motion to Impeach Detective Beane, doc. 73, is **DENIED.**