NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0587n.06

No. 15-6455

**FILED**

October 31, 2016

DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ERIC THOMAS, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant - Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE: KEITH, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Reserving the right to appeal the denial of his motion to suppress evidence obtained under a Kentucky state search warrant, Eric Thomas (Thomas) pleaded guilty to one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and one count of keeping a marijuana-involved premises in violation of 18 U.S.C. § 856(a). He was sentenced to 60 months' imprisonment and now appeals, asserting that (1) evidence gathered from a search incident to a traffic stop and from a subpoena of electric records was unconstitutionally obtained and should have been stricken from the search-warrant affidavit; (2) the warrant affidavit on its face lacked probable cause; and (3) the district court abused its discretion in failing to make essential factual findings in its memorandum order denying the motion to suppress. We **AFFIRM**.

I

On July 12, 2013, Taylorsville, Kentucky police chief Toby Lewis (Lewis or Chief Lewis) observed Thomas driving with an unbuckled seatbelt, a violation of Kentucky law. Lewis pulled Thomas over based on the seatbelt violation. While at Thomas's window, Chief Lewis smelled a strong odor of marijuana. As a result, Lewis explained to Thomas that the stop was for a seatbelt violation, but he could smell marijuana. He further explained that if Thomas had only a small amount of marijuana, he would give Thomas a citation and Thomas would be free to go. Thomas responded by pulling a marijuana cigarette from his shorts pocket and handing it to Lewis.

Chief Lewis asked Thomas to step out of his car for a safety pat-down. After stepping out, Thomas pulled a marijuana bud from his shorts pocket and handed this too to Lewis. Standing at the car, Lewis observed "grow trays and things" in the back seat. Uncertain of the situation, he called for backup. After Officer Daniel Wills arrived, Chief Lewis advised Thomas of his *Miranda* rights. When asked by Lewis, Thomas responded that he understood these rights. Regarding the cigarette and bud, Lewis told Thomas that they were "just looking at a citation," but that he first needed to confer with his colleague Officer Wills. *Suppr. Hrg. Tr.*, R. 36, at 10. Lewis then secured Thomas in the back of a patrol vehicle, explaining that this was for safety and that Thomas was not under arrest.

After speaking with Officer Wills, Chief Lewis directed Thomas to step out of the patrol vehicle, reiterating his *Miranda* rights and that he was not under arrest. In addition to the grow trays, Chief Lewis identified liquid fertilizer[1] in the back seat, prompting him to question whether these items, combined with the strong odor of marijuana, meant the car might contain

---

[1] At the suppression hearing, Detective Begley testified that the brand of fertilizer contained bat guano. Based on his professional experience he knew it to be used commonly in indoor marijuana growing. However, information related to the liquid fertilizer is not included in the search-warrant affidavit.

larger quantities of marijuana. Chief Lewis asked Thomas for consent to search the trunk of the car and he agreed, stating "[i]t's just dirt." *Id.* at 14. Chief Lewis recorded Thomas's consent on his cellular phone and the recording was admitted as an exhibit at the suppression hearing.

Police found approximately fifteen bags of potting soil, stabilizing sticks, and a grow light bulb in the trunk. Chief Lewis testified at the suppression hearing that in his professional experience the items found were consistent with indoor marijuana growing. Chief Lewis and Officer Wills took photos of the contents of the car and its trunk, which were also admitted as exhibits. Lewis questioned Thomas about whether he was using these supplies for growing marijuana; Thomas declined to answer directly, although during the traffic stop he asserted that the supplies were for remediating his poor soil and that he grew tomatoes. Police found no more marijuana. As promised, Chief Lewis issued a citation to Thomas and allowed him to drive away.

Because the traffic stop occurred in Spencer County and Thomas lived in Marion County, Officer Wills contacted the Kentucky State Police to determine if state police had any additional information on Thomas. After a series of interdepartmental conversations in which Marion County police indicated that they knew of Thomas, the Kentucky State Police drug task force began an investigation into Thomas's suspected involvement in growing marijuana.

The task force included members from the Campbellsville Police Department, including Detective Travis Begley (Detective Begley). Their focus quickly turned to Thomas's residence as a possible location where he might be growing marijuana. Based on internal police conversations, the task force discovered that Officer Alan Corbett had received complaints over

several years alleging that Thomas was growing marijuana at his residence.[2]  Deputy Ray Gardner offered that he had been to Thomas's residence on a separate complaint and had encountered vicious dogs there.  Detective Begley also drove past Thomas's residence and observed a large, opaque sheet-metal fence around the property.

As a final investigative step before seeking a search warrant, Detective Begley sought Thomas's electric records, based on his professional experience that premises used for indoor marijuana growing tend to have high electric bills due to lighting and other equipment.  Detective Begley requested a grand-jury subpoena from the Marion County commonwealth's attorney's office to be served on Inter-County Energy Cooperative (Inter-County), Thomas's electric utility.  A non-attorney employee of that office provided him with a printed grand-jury subpoena form.[3]  Detective Begley served the subpoena on an employee of Inter-County and questioned at least one other employee.  The Inter-County personnel provided twenty-four months of electric records for Thomas's account (which included two meters, one for the house and one for a trailer) and remarked that the bills appeared "high."  *Search-Warrant Affidavit*, R. 93, at 2.  They also recounted that Thomas or a female periodically appeared in person to pay his bill with large sums of cash, requesting that excess payments by credited to future bills.

Detective Begley submitted a search-warrant affidavit and a Marion County Circuit Court judge issued a search warrant on July 12, 2013.  Police executed the warrant later that day.  Among the items found and seized were two garbage bags of marijuana, processed and packaged

---

[2] The record contains no further information about these complaints—when they occurred, how many people complained, or how credible the concerns were—other than that they did not prompt police to open an investigation prior to the traffic stop in Taylorsville.

[3] The record contains no evidence that an attorney in the office was directly involved in authorizing or issuing the subpoena.  On cross-examination during the suppression hearing, Detective Begley testified that he had obtained a grand-jury subpoena "many times" and that "that's the way I've done it every time."  *Suppr. Hrg. Tr.*, R. 36, at 51.  The printed subpoena provided to Detective Begley did not include the name of a custodian of records, but this field was completed by an Inter-County employee who deemed herself as receiving the subpoena.

marijuana, 779 marijuana plants, indoor marijuana growing equipment (including grow lights and ballasts), firearms and ammunition, and other contraband.

## II

When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Johnson*, 707 F.3d 655, 657–58 (6th Cir. 2013).

## A

Thomas first challenges on Fourth Amendment grounds the evidence obtained during the traffic stop, arguing that Chief Lewis lacked probable cause to conduct a warrantless search of his car and that the consent he gave to the search violated his *Miranda* rights and was coerced. The Government contends that police had probable cause for a warrantless search, and, in any event, Thomas consented to the search. We focus here on the issue of consent, as it most directly and conclusively resolves the constitutionality of the search of Thomas's car.

Consent to a search must be voluntary and free of duress or coercion, express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). Thomas contends on appeal that police obtained his consent (1) after he had invoked his right to remain silent and (2) coercively.

In his opening brief, Thomas argues that when Chief Lewis asked about whether he had an indoor marijuana-growing operation, he invoked his *Miranda* rights with words to the effect of "I'm not going to tell you anymore and let's just leave it at that." *See Suppr. Hrg. Tr.*, R. 36, at 21. Thomas's brief implies that he was asked for and gave consent after invoking his *Miranda* rights. However, Thomas did not make this argument in the district court, and Chief Lewis testified at the suppression hearing that he believed this questioning and the *Miranda* invocation occurred after the car already had been searched. Our review of the suppression-hearing

transcript and the audio recordings of the stop reveals nothing that rebuts Chief Lewis's account of the timing of the consent and search.

Thomas further suggests that his removal from his car and placement in the back of the patrol vehicle had a coercive effect and that he did not appreciate that he had the option to refuse consent.[4]  An officer need not always inform the subject of a search of his or her right to refuse consent, but it is one factor in assessing voluntariness.  *Schneckloth*, 412 U.S. at 227.  The audio recording reveals, however, that Thomas was on notice of his right to refuse:  Chief Lewis states that Thomas has been read his *Miranda* rights and then twice asks for "permission" to search the car's trunk.[5]  Thomas consents without hesitation, stating that the trunk contains "just dirt." *Gov't Ex. 2.*  The record thus reveals Thomas's consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion."  *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)).

Accordingly, the traffic-stop evidence was obtained pursuant to the consent exception to the Fourth Amendment's warrant requirement and the district court did not err in denying Thomas's request to strike the traffic-stop evidence from the search-warrant affidavit.

B

Thomas next challenges the evidence obtained from Inter-County on the grounds that the grand-jury subpoena used by Detective Begley was defectively issued under Kentucky law.  He

---

[4] Thomas also alludes to "implied threats" police used to obtain his consent, although he does not point to evidence of such threats in the record.

[5] Thomas has compellingly argued, both at the suppression hearing and now in his opening brief on appeal, that the circumstances surrounding the traffic stop amounted to more than detention.  We need not determine, however, whether Thomas was "in custody" for *Miranda* purposes because the unrefuted record memorializes that at the least, Chief Lewis *Mirandized* him as a procedural precaution and that Thomas consented after he received the warning.  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*Miranda* warnings only necessary when a person is "in custody").

contends this defectiveness renders the Inter-County evidence unlawfully obtained under the Fourth Amendment. The initial question though is not whether the subpoena was defective, but whether Thomas had a Fourth Amendment privacy interest in his electric records that would give him standing to challenge a subpoena to a third party. *See United States v. Miller*, 425 U.S. 435, 442 n.2 (1976) ("We see no reason why the existence of a Fourth Amendment interest turns on whether the subpoena is defective."). We agree with the district court that Thomas did not have a Fourth Amendment privacy interest in his electric bills and thus he lacks standing to challenge the subpoena.

The Fourth Amendment "does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities" in the context of a police investigation of a potential criminal defendant. *Miller*, 425 U.S. at 443. Information voluntarily conveyed to a third party is not protected by the Fourth Amendment unless a defendant has a reasonable privacy expectation in that information. *Cf. Smith v. Maryland*, 442 U.S. 735, 742 (1979) ("[W]e doubt that people in general entertain any actual expectation of privacy in the numbers they dial. All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed."). This remains true "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Miller*, 425 U.S. at 443.

Thus, Thomas's standing to challenge the subpoena hinges on whether he had a reasonable expectation of privacy in his electric bills. *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000). To establish a reasonable expectation of privacy, he must show both (1) that

he subjectively did have that expectation and (2) that it is an objectively reasonable expectation that society is prepared to recognize. *Id.*

Thomas offers little to meet this burden, except to claim that the Kentucky Open Records Act (KORA) gave him an expectation of privacy. *See* Ky. Rev. Stat. Ann. § 61.870. KORA is an open-government statute that requires public agencies to allow inspection of public records, subject to certain exceptions. Among its enforcement procedures, KORA provides that if an agency denies inspection of a record, the requester may seek an opinion from the Kentucky attorney general on whether the denial was lawful. *Id.* at § 61.880(2)(a). Once the attorney general issues an opinion, each party has thirty days to appeal before the opinion becomes binding with the "force and effect of law." *Id.* at § 61.880(5)(a). Thomas cites an attorney-general opinion issued in a challenge to a public water utility's refusal to disclose customer records. The attorney general rejected the requester's challenge, stating that disclosure "would constitute a clearly unwarranted invasion of personal privacy" and that the utility's customers "have at least some expectation of privacy in their billing records." *In re: Don Wiggins/Winchester Mun. Utils.*, 1996 WL 506691 (Ky. Op. Atty. Gen. Aug. 20, 1996). Thomas contends that this opinion is binding on third-parties and that it logically extends to cover all utility billing records.

Thomas provides no support for the proposition that his electric bills fall within the scope of KORA—that Inter-County is a "public agency" under the statue and that the statute applies beyond the context of opening public records to inspection. *See id.* at §§ 61.870, 61.872. Nor has he offered a legal argument or authority supporting his claim that KORA creates a privacy interest protected under the Fourth Amendment or that the cited attorney general's opinion established the rights of third parties.

In contrast to Thomas's unsupported argument under KORA, the Supreme Court has rejected Fourth Amendment claims under similar circumstances. In *Miller*, the Supreme Court held that one does not have a protected privacy interest in banking records; *Smith* extended this holding to cover phone records. *Miller*, 425 U.S. at 443; *Smith*, 442 U.S. at 742 ("All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills."). Further, the Eighth Circuit has extended this holding to include electric records. *United States v. McIntyre*, 646 F.3d 1107, 1111–12 (8th Cir. 2011). As with banking and phone records, there is no Fourth Amendment privacy interest in the number of kilowatt hours one uses.

C

Thomas next challenges the search warrant as lacking probable cause on its face. Both federal and Kentucky courts consider the "totality of the circumstances" in determining whether probable cause exists to issue a search warrant. *Illinois v. Gates*, 462 U.S. 213 (1983); *accord Beemer v. Commonwealth*, 665 S.W.2d 912 (Ky. 1984). Under this standard, "[t]he test for probable cause is simply whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *accord Moore v. Commonwealth*, 159 S.W.3d 325, 329 (Ky. 2005). Individual pieces of evidence contained in a search-warrant affidavit need not stand on their own, but must establish together the "fair probability" required for probable cause. *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).

We consider the evidence "in the light most favorable to the United States." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). Here, the parties do not disagree on the material facts, only on their legal consequences. Accordingly we proceed to consider whether

the affidavit was legally sufficient for probable cause, taking it at face value. We give "due weight to inferences drawn from those facts by . . . local law enforcement officers." *Ornelas*, 517 U.S. at 699.

A search-warrant affidavit must "contain adequate supporting facts about the underlying circumstances for probable cause to exist . . . ." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Whitley v. Warden*, 401 U.S. 560, 564 (1971)). The search-warrant affidavit in this case provides four categories of information: (1) information from the traffic stop; (2) complaints received over the years by police about Thomas; (3) police observations of Thomas's property; and (4) employee observations from Inter-County.

Thomas had marijuana in his pocket during the traffic stop. He also had growing supplies in the trunk, including a grow light, stabilizing sticks, and fifteen bags of potting soil.[6] As Detective Begley testified at the suppression hearing, these supplies were consistent with those used in indoor marijuana growing. In his brief on appeal, Thomas characterizes the marijuana discovered during the traffic stop as a "small amount," and indeed it was. *Appellant's Br.* at 25. But the proximity between the marijuana possession and the growing supplies raised the possibility that Thomas was involved in growing marijuana. This is true although the juxtaposition was also consistent with someone who grows tomatoes and is merely a personal user of marijuana, as Thomas suggested to Chief Lewis.

Information from the traffic search supported only an inference that Thomas might be involved in growing marijuana. It did not establish probable cause for a search warrant; nor did it point to *where* evidence of this activity might be found. To justify a search, the circumstances must indicate why evidence of illegal activity will be found "in a particular place." *Gates*, 462 U.S. at 230. An affidavit for a search warrant "must state a 'nexus between the place to be

---

[6] The affidavit does not mention the liquid fertilizer.

searched and the evidence sought.'" *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998) (quoting *United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996)). Here, the affidavit relies on unspecified complaints that Officer Corbett had received over several years about marijuana growing at the Thomas property, police observations that the property had a high, solid metal fence and vicious dogs, and an indication of high electric usage. Detective Begley explained in the search-warrant affidavit that individuals involved in the drug trade commonly use opaque fences to conceal their activities and vicious dogs to protect drug-involved premises.

Thomas challenges the complaints received by Officer Corbett as too "vague" and "stale" to have probative value. *Appellant's Br.* at 25. We would agree if these complaints stood alone. Compared to tips from confidential informants, "[a]nonymous tips . . . demand more stringent scrutiny of their veracity, reliability, and basis of knowledge . . . ." *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003). Nevertheless, even if the complaints themselves hold limited probative value, they took on "an increased level of significance" once buttressed by Chief Lewis's observations from the traffic stop. *See id.* at 823. The grow equipment and supplies corroborated the complaints' accusation that Thomas was involved in growing marijuana. This is not overcome by the possibility that Thomas might have been growing tomatoes.

Thomas also argued that the complaints were stale. Probable cause deals with present probabilities on where evidence of criminal activity will be found. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). Whether evidence is too stale to hold probative value for probable cause "must be determined by the circumstances of each case." *Sgro v. United States*, 287 U.S. 206, 211 (1932). "To show probable cause that contraband is where an officer's affidavit says it is, the affidavit must contain statements of fact 'so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *United States v.*

*Church*, 823 F.3d 351, 356 (6th. Cir. 2016) (quoting *Sgro*, 287 U.S. at 210). Here, the information from the traffic stop made the complaints relevant despite their age.

Thomas further argues that he erected the metal fence because a court ordered him to do so on account of his dogs, a fact not included in the search-warrant affidavit. At the suppression hearing, Detective Begley testified that he learned of the court order after he submitted the affidavit. Had the court order been disclosed in the affidavit, the presence of the fence might have been less probative. Still, the record does not indicate that Thomas was ordered to put up a concealing *opaque* fence. Even with the court order added, when viewed in the light most favorable to the Government, the affidavit supports the inference that Thomas wanted his property to be guarded by dogs and his activities concealed from public view.

Finally, police sought information on Thomas's electric use. A property used for indoor marijuana growing usually has electrical equipment such as lighting ballasts (containing lights similar to the one found in Thomas's car during the traffic search). At the suppression hearing Detective Begley testified that the power this equipment requires can lead to higher electric bills than would be expected at a property of comparable size and use. A relatively high electric bill would thus increase the likelihood that the residence contained an indoor marijuana-growing operation.[7]

Detective Begley served a grand-jury subpoena on an employee of Thomas's electric utility, Inter-County, who provided him with twenty-four months of electric records. Thomas asserts that his electric records were not probative of indoor marijuana growing absent some

---

[7] The search-warrant affidavit does not contain an explanation for why Detective Begley sought Thomas's electric records. Elsewhere in the affidavit, Detective Begley states: "I have found that subjects involved in [indoor marijuana-growing operations] will often possess items . . . including, but not limited to, specialized lighting used for the growth of marijuana, ballast, fans, air conditioners, dehumidifiers, [and] electric timers . . . ." *Search-Warrant Affidavit*, R. 93, at 3. In any event, we think it reasonably within a court's experience to draw the inference that Detective Begley made explicit at the suppression hearing. "A magistrate may draw 'the usual inferences which reasonable men draw from evidence.'" *United States v. Mfrs. Nat'l Bank of Detroit*, 536 F.2d 699, 702 (6th Cir. 1976) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

comparative analysis showing that his use was high. The search-warrant affidavit states only that employees familiar with the Thomas account thought that the bills "appeare[d] to be high." *Search-Warrant Affidavit*, R. 93, at 2. Thomas urges that before this opinion could be credited, a more formal or quantitative comparative analysis of the electric use was required. We acknowledge that this aspect of the search-warrant affidavit is underwhelming and perfunctory. Nevertheless, the information was provided by employees who appeared to have the factual information and context to support the conclusion that the bills "appeared to be high." This evidence was not conclusive of a grow operation, but supported the inference.

Standing alone, the individual pieces of information in the affidavit fail to establish probable cause. Thomas asserts that even taken together the information is insufficient. We disagree. When we consider the totality of the circumstances in the light most favorable to the Government, probable cause sufficiently emerges. From the traffic-stop evidence we may reasonably infer that Thomas was involved in either growing marijuana or tomatoes. The remaining information about Thomas's property—concealing fences, guard dogs, high electric bills, and complaints about drugs being manufactured there—justified the former inference and pointed to a "particular place" to be searched. *See Gates*, 462 U.S. at 230.

III

Lastly, Thomas contends the district court abused its discretion by failing to state "essential [factual] findings" in its memorandum opinion denying his motion to suppress. *See* Fed. R. Crim. P. 12(d). Specifically he contends the court failed to make essential factual findings with respect to his consent to the search of his car, the complaints received by Officer Corbett, and the Inter-County subpoena and evidence. Under Rule 12(d), when "factual issues are involved in deciding a [pre-trial] motion," a district court "must state its essential findings on

-13-

the record." This rule is mandatory and a district court abuses its discretion when it fails to comply. *United States v. Moore*, 936 F.2d 287, 288 (6th Cir. 1991).

As support for his argument, Thomas cites *United States v. Wright*. 625 F.3d 583 (9th Cir. 2010). In *Wright*, the Ninth Circuit reversed and remanded a suppression denial with instructions that the district court make essential factual findings. *Id.* at 604. *Wright*, though, is inapposite: it involved a two-sentence denial when contradictory testimony between a defendant and police left important facts unresolved. *Id.* at 601–04. In contrast, the district court set forth two pages of factual findings in its memorandum order denying Thomas's motion to suppress. *Mem. Op.*, R. 43, at 2–3. It also thoroughly incorporated these facts into its legal analysis. A district court does not abuse its discretion in choosing which facts are essential to its legal conclusions while omitting the rest.[8] *Cf. United States v. Moore*, 936 F.2d 287, 288 (6th Cir. 1991) (district court failed to provide any explanation for denial of suppression motion).

The district court's memorandum opinion sufficiently addressed the facts; there was no abuse of discretion.

\*\*\*

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

[8] Further, this court has not have been deprived of "essential findings" to review the denial, as we have available to us the same material facts that were before the district court. *Cf. United States v. Prieto-Villa*, 910 F.2d, 601, 610 (9th Cir. 1990) ("Essential findings on the record are necessary to facilitate appellate review.").